# SUSETTA PIETRUS v. J. R. WATKINS COMPANY AND OTHERS.[1]

July 1, 1949.

No. 34,804.

[1]Reported in 38 N. W. (2d) 799.

*John J. Sexton,* for appellant.

*C. C. Meixner* and *John A. Burns,* for respondent.

.THOMAS GALLAGHER, JUSTICE.

Action for damages sustained by reason of plaintiff's complete loss of her hair alleged to have resulted from her use of a bottle of Watkins Coconut Oil Shampoo sold her by defendant J. R. Watkins Company, a corporation, in May 1945, through its agent, defendant L. J. Coates. The jury returned a verdict of $20,000 in plaintiff's favor against the Watkins company, which has appealed from an order denying its alternative motion for judgment or a new trial. The company will hereinafter be referred to as defendant.

Plaintiff, 32 years of age at the time of the trial, a housewife living in St. Paul with her husband and two children, testified that in May 1945 she purchased a bottle of Watkins Coconut Oil Shampoo from said Coates, one of defendant's door-to-door salesmen; that it was recommended by such salesman as suitable and safe as a hair shampoo; that no analysis of the contents of the bottle appeared thereon; that immediately thereafter she used the shampoo substantially in accordance with directions appearing on the bottle; that at that time she was possessed of a head of heavy hair; that immediately after using the shampoo she felt a burning sensation in her scalp and hands; that her scalp turned red, whereupon she rinsed her hair, thinking that she had not completely removed the shampoo; that the following day she again used the contents

of the bottle for a second application; that after the second application her hair commenced to fall out and continued to do so until October or November 1945, at which time she had become almost completely bald; that during the time her hair was falling out her scalp was irritated and covered with sores; that she had no other illness or physical condition that could account for the loss of her hair; that she has been completely bald since November 1945; and that she used no other shampoo or preparation during the period described. She testified further that she had destroyed or lost the bottle actually used and could not produce it in court. At no time were the contents of this particular bottle analyzed.

Dr. Cecile Moriarty on behalf of plaintiff testified that she had treated plaintiff during the year 1945 for other illness; that throughout the period when plaintiff's hair was falling out she was otherwise generally in good health and had no physical condition that would cause the loss of her hair; that plaintiff's loss of hair was confined to her head, and that she is completely bald and required to use a hood or headdress to conceal her condition; that soaps and other compounds with a high alkali content would cause irritation to the scalp and might cause a burn or destroy the hair follicles; and that in her opinion plaintiff's baldness was permanent.

Evidence was submitted that the coconut oil shampoo manufactured by defendant included such materials as glycerine, alcohol, potash lye, distilled water, perfume, and alizarin cyanine green; that the chemicals used in making it included alkali; that about March 15, 1945, defendant had been informed by a representative of the federal pure food and drug administration that the Watkins Coconut Oil Shampoo did not meet the requirements and regulations of the pure food and drug law, in that the alkali content thereof was excessive; that the product failing in this respect had been produced in December 1944 and withdrawn from the market in March 1945; that the quantity recalled has a pH (standard for judging percentage of alkali content) of 9.1 to 12; that this quantity was recalled to reduce it to a pH of 10 or lower.

Defendant's chemist testified that he had no knowledge or record as to the quantity of shampoo which was actually returned from the trade. The manager of the Watkins store in St. Paul, who supplied the salesmen operating in that city, testified that at the time he received the letter recalling the shampoo in March 1945 he had none left in stock.

Defendant's medical expert, a professor of dermatology, testified that in his opinion plaintiff had alopecia areata, and that this could not have been caused by any known substance applied externally to the hair. His testimony indicated that he inspected but did not examine plaintiff.

On appeal, defendant asserts (1) that the evidence did not sustain a finding that plaintiff's loss of hair was caused by defendant's negligence in providing her with a product capable of producing such effect; (2) that the court erred in failing to instruct the jury that defendant could not be held liable unless it had actual or constructive knowledge of a characteristic in its product which would cause baldness to those to whom it was sold for use; and (3) that defendant was prejudiced by plaintiff's efforts during the trial designed to show that at one time prior to the present action defendant had been charged with violation of the pure food and drug act.

■ There is a conflict of opinion with respect to the degree of proof required in actions of this kind. A number of courts have denied relief where evidence was lacking as to the contents of the product alleged to be inherently dangerous or poisonous, or in the absence of evidence that such ingredients would produce the harmful results claimed. See, Karr v. Inecto, Inc. 247 N. Y. 360, 160 N. E. 398; Brewer v. Knight Drug Co. 55 Ga. App. 352, 190 S. E. 365; Tremaine v. H. K. Mulford Co. 317 Pa. 97, 176 A. 212.

■ Minnesota has adopted a more liberal rule in this type of litigation. Many decisions of this court have sustained verdicts based upon evidence similar to that involved in the instant case. See, Wilson v. Goldman, 133 Minn. 281, 158 N. W. 332; Tiedje v. Haney,

184 Minn. 569, 239 N. W. 611; Berry v. Daniels, 195 Minn. 366, 263 N. W. 115.

■ It is true that there was no evidence as to the contents of the particular bottle used and no chemical analysis thereof. This of itself does not appear to be vital. In Tiedje v. Haney, 184 Minn. 569, 239 N. W. 611, plaintiff's recovery was sustained, although no evidence was introduced as to the cold tablets involved or the contents thereof which, it was alleged, resulted in the damages sustained.

In Bark v. Dixson, 115 Minn. 172, 173, 131 N. W. 1078, 1079, Ann. Cas. 1912D, 775, this court stated:

"* * * It seems to be the opinion of counsel for defendants that, because there was no chemical analysis of the meat or of the waste, there was no proper evidence of its tainted or poisonous condition. But it does not take an entomologist or bacteriologist to discover that a beefsteak is rotten and unfit for food. The evidence of plaintiff and of other witnesses who tasted the meat to the effect that it was bad was competent, and with the admission of one of defendants that six of his servants were ill that night, together with the symptoms that developed, clearly make a prima facie case. We think the evidence abundantly justified the verdict."

In Berry v. Daniels, 195 Minn. 366, 263 N. W. 115, the jury's verdict was sustained although the only evidence of the contents of the bottle complained of was plaintiff's testimony that he detected the odor of formaldehyde therein, and the druggist selling the product testified that such odor was not present.

■ It is undisputed that the product here involved was manufactured by defendant and sold by its agent directly to plaintiff. The label thereon indicated that its intended use was as a hair shampoo. Implied therein was a warranty that for such purposes it was suitable and fit.

The evidence reasonably supports a finding that the bottle purchased by plaintiff came from a quantity which contained alkali to an extent which made it unsafe for its intended purpose. No tests of the amount of alkali contained therein had been made by defend-

ant. No consultations had been held with experts as to the safety of the alkali content thereof. The federal pure food and drug administration demanded that this entire quantity be withdrawn from the market because of its excessive alkali content.

Thereafter, defendant was required to reduce such content so as not to exceed a pH 10, although some of this quantity had an alkali content as high as pH 12. The inference can be drawn from the testimony of plaintiff's physician that excessive alkali in a hair shampoo would be harmful to the scalp, would cause burning thereof, and destruction of the hair follicles. Plaintiff's own testimony was to the effect that immediately after she applied the contents of the bottle in question she experienced a burning sensation in the scalp, suffered irritation and sores thereon, followed by the continuous loss of her hair until she became bald.

Defendant had placed the defective quantity on the market shortly prior to the time plaintiff made her purchase from its agent. Its local warehouse in St. Paul had stocked a substantial amount thereof, all of which had been sold in St. Paul and vicinity about the time plaintiff made her purchase. When defendant sought to withdraw this quantity from the market, in response to the demand of the federal pure food and drug administration, it had already been disposed of from the warehouse, and presumably was already in the hands of defendant salesmen in St. Paul and vicinity. The close proximity in time of these events and plaintiff's purchase would reasonably support the inference that the bottle purchased by plaintiff was one of the original bottles condemned or ordered withdrawn by the federal pure food and drug administration containing the excessive amount of alkali which produced the harmful results complained of.

Based upon the foregoing authorities, we must conclude that the evidence here was sufficient to sustain the jury's finding.

■ Defendant asserts that the trial court erred in failing to instruct the jury that it would not be liable unless it had actual or constructive knowledge of the characteristics of its product which would cause baldness to those to whom it was sold. The

pleadings, evidence, and theory of trial in the lower court are sufficient to sustain a verdict based upon a breach of implied warranty of fitness for purpose.

The rule appears well established that in an action for damages based upon breach of an implied warranty of fitness for purpose in cases involving sale of defective drugs or foods it is unnecessary to allege or prove that the manufacturer had actual knowledge of the contents thereof. See, 1 Williston, Sales (Rev. ed.) § 237, and numerous cases cited therein. See, also, Anderson v. Van Doren, 142 Minn. 237, 172 N. W. 117; Hjorth v. Albert Lea Machinery Co. 142 Minn. 387, 172 N. W. 488; Bekkevold v. Potts, 173 Minn. 87, 216 N. W. 790, 59 A. L. R. 1164.

As stated in 46 Am. Jur., Sales, § 806:

"* * * the manufacturer as a rule will be charged with notice of the quality of the article that he himself has made, and cannot excuse himself upon the ground that he did not know its dangerous qualities."

And *Id.* § 801:

"Knowledge on the part of the seller, of the falsity of the warranty is not an essential element of his liability * * *. While there are expressions to be found in some decisions to the effect that the seller is liable only if he knew, or had reason to believe, that the warranty was false, these decisions appear to be dealing with liability for fraud as distinguished from liability for breach of warranty."

See, also, 22 Am. Jur., Food, § 114.

As above indicated, the evidence here sustains a finding that the product sold contained an excessive amount of alkali, which could destroy hair follicles, and that this result followed plaintiff's use thereof. Under the authorities cited, it was unnecessary to show that defendant had knowledge of the excessive alkali content or of its harmful effects.

■ Defendant asserts that it was prejudiced by plaintiff's efforts during the trial designed to show that prior to the action it had been charged with a violation of the pure food and drug act. Plain-

tiff's efforts in this respect consisted of propounding several questions to defendant's employes designed to bring out this fact in relation to the products here involved. Subsequently, defendant disclosed that it had been ordered by the federal pure food and drug administration to withdraw a quantity of the product from the market. As stated above, it could be reasonably inferred that plaintiff's purchase came from such quantity. Under such circumstances, it would seem that plaintiff's efforts in this direction were proper and related to material evidence which should have been before the court and jury.

In any event, the record discloses that after the trial court sustained defendant's objection to this line of questioning plaintiff abandoned it, but made offers of proof in connection therewith outside the presence of the jury. Subsequently, after plaintiff had rested, defendant made the following opening statement to the jury:

"* * * some reference to a violation of the Pure Food & Drug Law, in respect to a shampoo, a Watkin's shampoo, that was put on the market * * * that certain date that was mentioned in December, '45 and the certain date that was mentioned in January * * *.

"* * * so we will introduce and explain that to you and show what that difficulty was * * * [and] that it was impossible for Mrs. Pietrus to buy a bottle of Watkin's Cocoanut Oil Shampoo in May, '45 in St. Paul.

"At that time, when that matter developed, letters were sent out to all of the dealers of Watkins recalling that product that was then unsold. That did not, of course, we do not claim that it brought back all of the product, but we do claim and we think we can establish and show that it was not available to the dealers in St. Paul at that time, March 27th, and that it was not available to that dealer in St. Paul in the subsequent times complained of.

\* \* \* \* \*

"* * * we will show that this product, subsequent to the time it was complained about, has been under very rigid control and under very rigid tests and that all of the product leaving the plant

subsequent to that time, did not leave until these tests that were made, met the tests that were suggested and required by the representative of the Pure Food & Drug Law. In fact at that time there was in the plant, unbottled, some of that product and we will show that it was re-worked under the direction of the representative of the Pure Food & Drug Law, and the Administration here in Minneapolis and released to the trade under their permission and consent."

Thereafter, defendant submitted the testimony of its employes to the effect that about the time of plaintiff's purchase the federal pure food and drug administration had requested that defendant withdraw a quantity of its shampoo from the market because of its excessive alkali content; that it had sought to withdraw the same from the market, but that the quantity sold in the St. Paul area had already left the warehouse. Under such circumstances and in view of our conclusion as to the materiality of the evidence involved, we hold that the action of plaintiff's counsel in pursuing his inquiry to bring out the above facts did not constitute misconduct.

Affirmed.