## J. R. WATKINS CO. v. RAYMOND.

### No. 14150.

United States Court of Appeals
Eighth Circuit.

Nov. 13, 1950.

Rehearing Denied Dec. 8, 1950.

Patrick J. Ryan, St. Paul, Minn. (John J. Sexton and Robert J. Tyrrell, St. Paul, Minn., on the brief), for appellant.

Eugene A. Rerat, Minneapolis, Minn. (Frank L. Brady, Minneapolis, Minn., on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and RIDDICK, Circuit Judges.

GARDNER, Chief Judge.

This was an action brought by appellee against appellant to recover damages for

injuries alleged to have been sustained by her by reason of the use and application of Watkins Cocoanut Oil Shampoo which it was admitted was manufactured by the appellant J. R. Watkins Company. Plaintiff, a married woman, 49 years of age, in December, 1947, procured a bottle of Watkins Cocoanut Oil Shampoo. A friend who had been a beauty parlor operator and who had previously shampooed plaintiff's hair, shampooed her hair by applying part of the contents of the bottle of shampoo to plaintiff's hair. Following the completion of the shampoo plaintiff had a sensation of burning on the forehead and scalp and itching of the scalp. The scalp was red and itched for several days, following which plaintiff's hair started to come out at each combing, and by April, 1948, it was practically all gone. Later she lost her eyebrows and eyelashes. About a year later she lost all of the hair over her entire body. Prior to December, 1947, she had had a luxuriant growth of hair. It was her custom to shampoo her hair every two or three weeks, which custom she had followed for a long period of time.

It was alleged by plaintiff that it was represented by defendant that this shampoo had been compounded from pure ingredients of superior merit and quality; that it was free from deleterious, poisonous, infectious, or harmful materials, and wholly adapted to improve the user's hair and to give vigor, luster and tone to the hair and scalp of the user, but that contrary to these representations the shampoo used by plaintiff was carelessly, negligently and improperly compounded by defendant and contained poisonous, infectious, injurious and deleterious materials and chemicals, causing it to be imminently dangerous and harmful to health. The contents of the bottle of shampoo were not all used. Dr. Howard, a specialist in dermatology, examined plaintiff in June, 1948, and based on his examination and the history of the case, testified that in his opinion the loss of plaintiff's hair, eyelashes and eyebrows was due to the shampoo which plaintiff used in December, 1947. Part of the contents of this bottle of shampoo was analyzed by Dr. Hervey H. Barber, a chemist at the University of Minnesota, the analysis being made for the purpose of determining the alkalinity of the contents of the bottle of shampoo. Being called as a witness for plaintiff, he testified that every soap had to have an alkaline base; that to have a usable soap there must be what is referred to as a "pH", of 7 or more, and that soaps in general vary from 8 to 12; that if a soap contained a pH of 10.5 he would not be afraid to use it; that the pH in the bottle of shampoo submitted by plaintiff was 10.2. There was testimony by another chemist called as a witness for plaintiff to the effect that any soap having anything below 12 or 13 pH was a perfectly safe soap or shampoo.

At the trial Dr. Ryerson, head of the Department of Chemistry of the University of Minnesota, called as a witness for defendant, in open court made a test of the remainder of the shampoo contained in the bottle of shampoo produced by plaintiff as having been the shampoo used by her. This test showed a pH of 9.5, "almost 9.6." There was testimony that the burning, itching and irritation of the scalp described by plaintiff might have been caused by the rubbing incident to the giving of the shampoo, and that it might have been caused by "the mechanics as well as the chemical." Defendant called a number of other experts, among them Dr. Paul A. O'Leary, associated with the Mayo Clinic since 1917 and head of the Department of Dermatology since 1924, who had had experience with some 300 people who had alopecia; Dr. Francis E. Senear, a specialist in dermatology and head of the Department of Dermatology at the University of Illinois, College of Medicine; and Dr. Henry Michelson, a specialist in dermatology and Director of the Division of Dermatology at the University of Minnesota. All of these witnesses stated their positive opinion that plaintiff's condition as described by her was not and could not have been caused by defendant's shampoo or by any chemical externally applied to the human scalp. Dr. O'Leary who had examined plaintiff said that alopecia totalis was a disease and that plaintiff's condition as described by her "was the normal course of

events in an individual who is developing total alopecia." Other facts will be developed in the course of this opinion.

At the close of all the testimony defendant moved for a directed verdict which motion was denied and the case was submitted to the jury on instructions to which defendant saved certain exceptions. The jury returned a verdict in favor of the plaintiff for $27,000.00. Defendant moved for judgment notwithstanding the verdict or in the alternative for a new trial, which motion was denied and judgment entered pursuant to the verdict. Defendant seeks reversal on substantially the following grounds: (1) the court erred in denying defendant's motion for a directed verdict and its motion for judgment notwithstanding the verdict; (2) the court improperly permitted Mrs. Petrus to testify that at least a year before plaintiff's injury she used a bottle of defendant's shampoo and suffered loss of hair; (3) the court erred in charging the jury that the evidence given by the expert witnesses who testified upon the trial might be disregarded.

In considering the question of the sufficiency of the evidence we must view the evidence in a light most favorable to the plaintiff and to assume as proved all facts which the testimony reasonably tended to prove. Duncan v. Montgomery Ward & Co., 8 Cir., 108 F.2d 848; Asher v. United States, 8 Cir., 63 F.2d 20. There must, however, be substantial evidence to warrant the submission of the issue to the jury and the trial court can not properly submit an issue to the jury on a mere scintilla of evidence. The question as to whether or not the evidence is substantial is one of law to be determined by the court. Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819; Simkins Federal Practice, 3rd Ed., Sec. 626.

In reviewing the testimony it is necessary to consider what plaintiff was required to prove in order to entitle her to recover. We turn first to the allegations of plaintiff's complaint. She alleged that the defendant represented that its product was compounded "from pure ingredients and as being of superior merit and quality and as being free from deleterious, poisonous, infectious, or harmful materials, and wholly adapted to improve the user's hair * * *", and she also alleged that the shampoo which she used "contained poisonous, infectious, injurious and deleterious materials and chemicals." In submitting this vital issue the court in its instructions among other things charged the jury that, "The burden rests upon the plaintiff to further establish by a fair preponderance of the evidence the following points: That she used Watkins Cocoanut Oil Shampoo according to directions furnished by the defendant; that this shampoo contained deleterious or poisonous material or substances in dangerous quantities; that this latter fact was unknown to her and that as a direct and proximate result of the use of this product she suffered damages."

The court then specified certain elements which must be found by the jury in order to entitle plaintiff to a verdict. Among these was the following: "That the shampoo contained dangerous ingredients in quantities likely to produce injury."

In the final analysis the verdict rests upon the testimony of the plaintiff that she used the defendant's shampoo, that immediately her scalp became red, itchy and irritated, that shortly thereafter her hair began to fall out, that the hair from her scalp, her eyebrows and eyelashes disappeared, and that after about a year the hair from her entire body fell out, and the testimony of Dr. Howard.

We have heretofore referred generally to the testimony of Dr. Howard but we think it requires further analysis. He based his opinion that the shampoo caused plaintiff to lose her hair solely upon the facts that plaintiff used the shampoo and later lost her hair. This, of course, added but little to the testimony of plaintiff. Among other things he testified as follows:

"Q. So that if Mrs. Raymond came to you and exhibited her scalp showing no hair on it and without saying anything more to you said, 'Now in your opinion what caused that?'—you wouldn't be able to give her any answer, would you? A. That is right.

928

"Q. And by the same token if she told you that she had used a shampoo and it was established that the amount of alkali in that shampoo was one-twentieth of normal, then by the same reasoning you would conclude that that shampoo was what caused the baldness? A. That is right.

"Q. Or if it was even one-fiftieth? A. That is right.

"Q. Or one-ninetieth? A. That is right.

"Q. It wouldn't make any difference? A. That is right.

\* \* \* \* \* \*

"Q. Then I think that you said that if she came to you and said she used a soap which was a very weak solution that you would say that was the cause of it? A. You are right.

"Q. In other words, your opinion is based upon what she says she did. That is what your opinion is based on? A. Based on the history that she used a certain something and that something produced certain results."

■ According to this testimony the shampoo could have caused plaintiff's condition whether it contained a chemical substance capable of producing those results or not. There is nothing in this testimony to indicate that the ingredients in the shampoo could or did cause plaintiff's loss of hair. The testimony did not tend to show that the shampoo contained poisonous, infectious, injurious and deleterious materials and chemicals as alleged in the complaint and as described in the instructions of the court; in fact, it adds nothing to plaintiff's testimony that she used the shampoo and that thereafter her hair began to fall out. This testimony shows no causal connection between the use of this shampoo and the resulting falling out of plaintiff's hair. The mere suffering of this illness following the use of the shampoo did not tend to prove that the shampoo was poisonous or infectious. Collings v. Northwestern Hospital, 202 Minn. 139, 277 N.W. 910; Moses v. St. Barnabas Hospital, 130 Minn. 1, 153 N.W. 128. If the condition of plaintiff following the use of this shampoo had gone without explanation there might be some ground for a presumption that the contents of the shampoo were deleterious. There was, however, undisputed evidence as to the ingredients of this shampoo and their qualities, and there was the undisputed testimony of eminent specialists that the ingredients could not have caused plaintiff's condition. The evidence was without dispute that all soaps contain lye in combination with other ingredients resulting in alkalinity without which there can be no soap. Defendant's shampoo contained lye and plaintiff's case was dependent upon whether or not it contained excessive alkalinity. As has been recited, the contents of the bottle of shampoo produced by plaintiff, a portion of which was used on her head, was analyzed by experts appearing for plaintiff. The testimony of Dr. Barber, who was plaintiff's witness, was to the effect that the shampoo contained a caustic described as an alkaline content expressed in terms of pH 10.2. There is no testimony that such a shampoo was or could be harmful in its application to the human scalp. Dr. Barber himself said he would not be afraid to use such a shampoo. Another witness for plaintiff, Dr. Jilk, stated that soap having anything below 12 or 13pH was a perfectly safe soap for shampooing. Not only this but there was undisputed testimony that alopecia totalis is a disease which occurs with some frequency and that such a disease would concur closely with any soaping of the hair and with the use of any ingredients or any soap or shampoo which might be applied to the scalp. Then it appeared that the hair on the rest of plaintiff's body also fell out and this was not subjected to shampoo. Presumptions can not be weighed in the balance against evidence. As said by the Supreme Court in Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 62 S.Ct. 156, 161, 86 L.Ed. 89:

"Whether we label this permissible inference with the equivocal term 'presumption' or consider merely that it is a rational inference from the facts proven, it does no more than require the bailee, if he would avoid the inference, to go forward with evidence sufficient to persuade that

the non-existence of the fact, which would otherwise be inferred, is as probable as its existence. * * *

\* \* \* \* \* \*

"Here petitioner relied on the inference to be drawn from the unexplained sinking of the barge to sustain its burden of proving unseaworthiness. But the evidence did not stop there. To rebut the inference, respondent came forward with evidence fully disclosing the circumstances attending the sinking. Inspection of the barge before the loading began and after she sank, and again after she was raised, failed to disclose any persuasive evidence of unseaworthiness."

In Heffter v. Northern States Power Co., 173 Minn. 215, 217 N.W. 102, 103, the court considered the applicability of the doctrine of res ipsa loquitur. In the course of that opinion it is said: "It may happen that a plaintiff makes a prima facie case by showing the accident with its attendant circumstances, and yet he may destroy by his own evidence the application of the doctrine."

See, also Topinka v. Minnesota Mutual Life Ins. Co., 189 Minn. 75, 248 N.W. 660; Honer v. Nicholson, 198 Minn. 55, 268 N. W. 852.

In the instant case plaintiff's loss of hair was not left without explanation. At least three eminent specialists in dermatology testified positively that defendant's shampoo did not and could not cause plaintiff's condition. In a recent case entitled De Vere v. Parten, 222 Minn. 211, 23 N.W.2d 584, 587, action was brought by an employee against her employer, alleging that while employed she was subjected to and inhaled carbon tetrachloride vapors, causing her to become afflicted with the disease known as transverse myelitis, which in turn produced permanent paralysis of the body from above the hips to the toes. It was admitted that there was some carbon tetrachloride vapor in defendants' machine shop where plaintiff was employed. In the course of that opinion the court among other things said:

"Plaintiff called three medical witnesses, who gave expert opinions that the trans-verse myelitis from which she was suffering was caused by the carbon tetrachloride vapors she inhaled in defendants' shop. Neither the medical experts nor the other witness who preceded them testified to the density of the concentration of the carbon tetrachloride vapors in defendants' shop. The medical experts in their testimony enumerated trauma and various sorts of germ infection as known causes of transverse myelitis and excluded all of them as the cause in plaintiff's case. One of plaintiff's medical experts, Dr. Henry W. Quist, did not testify as to what concentration of carbon tetrachloride was harmful, but the others, Dr. Julius Johnson and Dr. J. F. Corbett, testified that it is generally recognized by medical men that the concentration must be 100 parts of carbon tetrachloride to 1,000,000 parts of air. Without knowing whether the concentration to which plaintiff was exposed in defendants' shop was of such density as to be harmful and without showing that carbon tetrachloride might be an efficient cause of plaintiff's transverse myelitis, the doctors testified that in their opinions the inhalation by plaintiff of carbon tetrachloride vapors in defendants' shop was the cause of the transverse myelitis from which she was suffering. This they did by a process of reasoning that, since plaintiff and the three other employees had the so-called preliminary symptoms of such poisoning and there was no other known cause thereof, plaintiff's disease was caused by such poisoning. * * *

"* * * The uncontradicted testimony of defendants' medical experts was to the effect that virus is a common cause of transverse myelitis and that generally it is the cause where the disease cannot be traced to other known causes. They testified that plaintiff's was such a case.

"Plaintiff failed in her effort to establish carbon tetrachloride poisoning as the cause of the transverse myelitis from which she is suffering, because it appears as a matter of law that the concentration to which she was exposed was harmless."

The doctrine of this case seems to us to preclude the right of recovery in the instant case. It is, however, contended by

plaintiff that under the doctrine of Pietrus v. J. R. Watkins Co., 229 Minn. 179, 38 N.W.2d 799, 800, she was entitled to have her case submitted to the jury. The Pietrus case involved the loss of hair which was claimed to have resulted from the use of Watkins shampoo. In that case the remaining contents of the shampoo bottle were not available. It was, however, shown that all of the shampoo made by defendant during December, 1944, had been condemned by the Federal Pure Food and Drug Administration because of its ingredients and it was in evidence that Mrs. Pietrus had gotten and used some of the shampoo that had been thus condemned. The medical testimony produced by her was "that soaps and other compounds with a high alkali content could cause irritation to the scalp and might cause a burn or destroy the hair follicles". There was no analysis of the contents of the bottle of shampoo used by Mrs. Pietrus as there was in the instant case and the court was of the view that there could be recovery on the testimony of the plaintiff and her doctor in the absence of specific evidence based upon chemical analysis of the contents of the bottle of shampoo which she had used. There was evidence in that case that there was an attempt to withdraw the shampoo from the market and this was in the nature of an admission by the defendant that it contained deleterious substances. Thus the court among other things said:

"The evidence reasonably supports a finding that the bottle purchased by plaintiff came from a quantity which contained alkali to an extent which made it unsafe for its intended purpose. No tests of the amount of alkali contained therein had been made by defendant. No consultations had been held with experts as to the safety of the alkali content thereof. The federal pure food and drug administration demanded that this entire quantity be withdrawn from the market because of its excessive alkali content.

"Thereafter, defendant was required to reduce such content so as not to exceed a pH 10, although some of this quantity had an alkali content as high as pH 12. The

inference can be drawn from the testimony of plaintiff's physician that excessive alkali in a hair shampoo would be harmful to the scalp, would cause burning thereof, and destruction of the hair follicles. * * *"

■ We think the case is clearly distinguishable from the case at bar and we conclude that there was no substantial evidence sustaining the vital claim that the defendant's shampoo contained poisonous, infectious, injurious and deleterious materials and chemicals. It results that the court should have granted defendant's motion for a directed verdict and not having done so should have granted defendant's motion for judgment notwithstanding the verdict. The judgment appealed from is therefore reversed and the cause remanded with directions to dismiss the action.