### CORDLE v. KELLY et al.
### Civ. No. 479.

United States District Court
D. Minnesota, First Division.

Dec. 28, 1953.

---

Mordaunt & Mordaunt, by Roy J. Mordaunt, Minneapolis, Minn., for defendants Kelly and Gross in support of said motion.

F. H. Durham and A. M. Lystad, Minneapolis, Minn., for plaintiff in opposition thereto.

Lees & Bunge, by L. M. Engelhard, LaCrosse, Wis., for defendants Pritchard and Twin Cities-Winona Motor Express, Inc., in opposition thereto.

DONOVAN, District Judge.

This action to recover damages for the wrongful death of Harry R. Cordle was first commenced against Donald L. Kelly and Gross Common Carrier, Inc., and tried before a court and jury at Winona. The jury verdict was for defendants. The Court, Honorable Robert C. Bell, granted a new trial. Plaintiff then commenced a second action naming the same defendants, together with two additional defendants, namely, Harold T. Pritchard and Twin Cities-Winona Motor Express, Inc. The four defendants will be referred to as Kelly, Gross, Pritchard and Motor Express.

At the second trial the jury returned a verdict for plaintiff and against Kelly and Gross in the sum of $17,500. A second verdict was returned in favor of defendants Pritchard and Motor Express.

By appropriate and timely motion, defendants Kelly and Gross seek judgment notwithstanding the verdict, or a new trial, contending:

1. The verdict is contrary to the evidence.

2. The verdict is contrary to the law.

3. Error by the trial court.

(1) Is the verdict contrary to the evidence? The first point raised by movants challenges the weight and sufficiency of the evidence, and consideration

thereof necessitates a summarizing of the pertinent facts.

Kelly, during the course of his employment by Gross as a driver of a tractor-trailer combination truck, arrived at about noon on September 17, 1951, at the loading platform of J. R. Watkins Company, on Chestnut Street, in the City of Winona. Arriving thereat, he found decedent's tractor-trailer combination backed up to and flush with one of two doors furnished for loading. Kelly thereupon maneuvered his truck so as to park parallel with decedent's truck and backed to within 18 inches of the only remaining door so as to leave a means of ingress and egress to and from the Watkins building. Kelly entered the building, as customary, by climbing up in the space thus left between the truck and the building. It is undisputed that the trailer in question weighed 9500 pounds and that the attached tractor weighed 7500 pounds. There was a slight dip of the crown of the street where the tractor was parked, and the crown of the street was 8¾ inches lower than the driveway at the building line, adjacent to which the trailer was parked by Kelly.

Pritchard next arrived, driving a similar tractor-trailer combination as an employee of Motor Express. Finding the only available doors for loading occupied, he parked his tractor-trailer on Chestnut Street and parallel with the Watkins building. That the Cordle, Gross and Motor Express trucks were parked as above set forth is undisputed.

Kelly and Gross contend that the braking mechanism of the Gross truck was in good condition. Kelly testified that before leaving his truck he applied the vacuum brakes and the emergency brake, and that he also left the engine in reverse gear after turning off the ignition. This is uncontradicted. That there was sufficient space between the Gross truck and the building to permit Pritchard to enter as Kelly did is undisputed. That Pritchard had to wait for Cordle or Kelly to vacate before he could back his truck to the loading platform is not denied. Upon entering, Pritchard learned Cordle was leaving, and he followed him out of the building to the only means of egress and at which point Cordle met with mortal injuries.

The scintilla of evidence yardstick, laid down in the case of J. R. Watkins Co. v. Raymond, 8 Cir., 184 F.2d 925 [1] (and upon which, together with the cases cited therein, movants rely), is exacting, and so for greater accuracy we quote excerpts from the transcript of testimony given by Pritchard (the only eyewitness to the accident), as follows:

"Q. And on September 17, 1951, you were employed by the Twin Cities-Winona Motor Express? A. Yes.

"Q. And on that day you had one of their trucks at the Watkins loading platform on Chestnut Street? A. Yes.

"Q. What time did you get there with your truck? A. Shortly before one.

"Q. And where did you park your truck? A. On Chestnut Street side facing north.

"Q. You parked it out on the street? A. Yes.

"Q. Because, as I understand the testimony, the north door was blocked by the Cordle truck and what we call the south door was blocked by the Gross truck? A. Yes.

"Q. You parked your truck somewhere on Chestnut Street? A. Yes.

"Q. In the street proper? A. Yes.

"Q. And then did you get out of the truck? A. Yes.

"Q. And enter the Watkins building? A. Yes.

1. Since the Watkins decision, the Supreme Court of Minnesota had occasion to consider burden of proof and adhered to and followed the Pietrus Case [Pietrus v. J. R. Watkins Co.], 229 Minn. 179, 38 N.W.2d 799, in these words:

"* * * In action for breach of warranty in sale of a bottle of hair dye, proof of harmful ingredients of bottle causing the harm is not required."

See Schilling v. Roux Distributing Co., Minn.1953, 59 N.W.2d 907, 908, 918.

"Q. And how did you get in? A. In behind the Gross truck.

"Q. And I understand it's customary for you truck drivers to enter and leave behind a truck that has that space like the Gross truck? A. Yes.

\* \* \* \* \* \*

"Q. Who left the building first? A. Cordle.

"Q. And just tell us what happened to Cordle. A. Well, he left the building by getting down, you know, in the rear of the truck.

"Q. Which truck? A. The Gross Common Carrier.

"Q. He left it first, and were you behind him? A. Yes.

"Q. Right behind him? A. Yes.
\* \* \* \* \* \*

"Q. Now, as Cordle left this Watkins Warehouse you followed him, you say? A. Yes.

"Q. How far back were you from him—how far away were you from him? A. Just walking distance.

"Q. Well, how many feet back of him were you? A. Oh, four or five, similar to that.

"Q. And he was directly in front of you, is that right? A. Yes.

"Q. And then you saw him— what did he do, jump down between those—between the building and the trailer there? A. Well, he just got down.

"Q. How did he do it? How did he get down? A. I think he put the palm of his hand on the back of the unit because the unit was close to the door. It must have been closer than when the man went in because he had to go out sideways.

"Q. Well, in other words then, you saw him put his hand on the rear of the trailer and then he jumped down, did he, in between? A. Well then, the other hand was at that loading door, you know, it tapers down a bit.

"Q. Well, in other words, he got down sideways, is that right? A. Got down sideways.

\* \* \* \* \* \*

"The Court: As he left the building you saw the truck move back, is that it? A. Yes.

"Q. And as a result of the moving back, Mr. Cordle was pinned against the building, is that correct?

"Mr. Mordaunt: I object to that upon the grounds it's leading.

"The Court: It is leading, but it is in the case already. Overruled.

"By Mr. Englehart: Q. Is that correct? A. Yes.
\* \* \* \* \* \*.

"Q. What, if anything, did Mr. Cordle do after he was pinned by the Gross truck? A. Yelled for help.

"Q. Can you say what he yelled? A. 'Help, get this truck off of me' !
\* \* \* \* \* \*

"Q. Did you have any difficulty in getting out between the Gross truck and the door? A. Yes.
\* \* \* \* \* \*

"Q. Now then, will you tell the Court and the jury what you did immediately after you got out? A. Immediately after I got out I run around the front of the truck, got in the truck, found that the truck was in gear and the brakes were set, and I started the truck as fast as I could and put it into forwarding gear and drove it off the man.
\* \* \* \* \* \*

"Q. Will you just go step by step as to what you did inside the tractor in order to get this unit off of Mr. Cordle. A. Well, knowing the truck was in gear, I held my foot on the brake, crossed my feet because the starter is on the opposite side, turned the switch on, but still holding my foot on the brake so the unit couldn't release back any further, got the truck started, then got into

a forwarding gear. Then I had my hand on the emergency at all times so when I had the motor speed up a little higher speed I released the emergency at the same time I went forward.

"Q. Would you have any opinion, Mr. Pritchard, as to how long that particular transaction took? A. Oh, just a matter of moments.

"Q. And where did you move the truck? A. I moved it straight ahead.

"Q. And can you tell the Court and jury whether there was any slippage when you released the truck mechanisms? A. Well, there is a slight slippage in changing gears.

"Q. What do you mean by slippage? A. Well, in changing gears, by the time you let the clutch out it would release a trifle.

"Q. And which way would the truck go? A. It would release back.

"Q. Have you any opinion as to how far that slippage was in terms of releasing? A. No.

"Q. But there was some slippage? A. Yes.

"Q. What, if anything, did you do after you moved the unit away from Mr. Cordle? A. After I moved the unit I was going back to see what happened, but by that time Kelly had already taken care of the injured man, so, in turn, my truck and with the Gross truck, was blocking the street. So therefore I had to move my unit to make room for the ambulance.

\* \* \* \* \* \*

"Q. Now, isn't it a fact, Pritchard, that the first thing that you heard Cordle holler help was when he jumped down in there, is that right? A. Yes.

"Q. That's when you heard that? A. Yes.

"Q. And the fact is Mr. Pritchard, that you never did see that trailer move backward, isn't that right? You didn't see it move back, you saw him jump down and holler, wasn't that right? A. Yes.

\* \* \* \* \* \*

"Q. Did you see the Gross Common Carrier tractor—trailer, rather, move at the time when Mr. Cordle jumped down into the area from the rear to the building? A. Yes.

\* \* \* \* \* \*

"Q. You definitely saw the truck move back? A. Yes.

"Q. I believe you also testified it pinched Mr. Cordle between the truck and the building? A. Yes.

"Q. And then he hollered for help? A. Yes.

\* \* \* \* \* \*

"Q. Now, you want to tell us you not only saw the truck back, but you saw him walk towards his left, is that right? A. I said started to move."

The foregoing is substantially all the evidence directed at the cause of death. The sixth last question and answer asked of the defendant Pritchard is emphasized, for the reason that counsel for movants contend the answer thereto impeaches Pritchard and leaves the case for plaintiff in the realm of conjecture and speculation to such an extent that a scintilla of evidence, at very best, is the basis for the verdict.[2]

Did the witness direct his affirmative answer to the question, "You didn't see it move back?" or to the question, "You saw him jump down and holler?" The very next question put to the witness by his own counsel definitely states that Pritchard saw the truck move back at the time "Cordle jumped down."

2. In support of their alternative motion, movants cite Chicago, M. St. P. R. Co. v. Coogan, 271 U.S. 472, 46 S.Ct. 564, 70 L.Ed. 1041; Pennsylvania R. Co. v.

Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819, to the effect that "the scintilla rule has been definitely and repeatedly rejected by federal courts."

■ The record of the instant case is not one where the proved facts give equal support to each of two inconsistent inferences. If Pritchard is to be believed, he actually saw the Gross truck move back simultaneously with Cordle's jumping down between the truck and the building and prior to Pritchard's engaging in the act of rescue as above outlined. With good brakes properly applied, the truck should not have moved. This is not a case where the physical facts contradict the testimony of any of the witnesses. Kelly left space for ingress and egress. Pritchard and he entered the building with the aid of said space. Decedent's physique did not differ from that of Kelly or Pritchard in weight or build so as to make it impossible for him to follow the custom and practice in leaving the building via said space. This is mentioned for the reason that movants contend decedent became wedged therein when he "jumped down", as opposed to Pritchard's testimony that he saw the truck move back against decedent and pin him to the wall. Before Kelly came out of the building Pritchard had moved the truck. Hence we have no eyewitness as to what Pritchard saw and did other than Pritchard, who admits that when he moved the truck forward and away from decedent there was a slight slippage backwards before the forward movement. As the Court views the record, the jury could find in favor of or against all of the defendants. Instead, they found against Kelly and Gross and absolved Pritchard and Motor Express. A verdict against Pritchard and Motor Express and in favor of Kelly and Gross would find support in the evidence. But in choosing the parties liable, once plaintiff has made out a case, that choice is peculiarly within the province of the trier of the facts of the instant case. In this respect the trial court cannot substitute itself for the jury, despite the Court's difficulty in trying to allocate blame and to distinguish between the four defendants in determining cause and responsibility for the death of Cordle.[3] The Court cannot say that Pritchard is impeached or discredited by the double question which he answered in the affirmative, particularly in the light of his later reaffirming the testimony he had already given here and also at the first trial of the same issues before Judge Bell. The credibility of Pritchard and the truth of his testimony were properly jury questions.

■ If decedent's negligence contributed to the accident, there can be no recovery by plaintiff. This was also a question for the jury and was resolved in favor of plaintiff by the verdict. The verdict for plaintiff is aided by the presumption that "a dead man exercised due care for his own safety."[4] If the Court were making the finding of fact, the result may have been otherwise than that arrived at by the jury.

(2) Is the verdict contrary to law?

■■ On the record of the instant case, it cannot be said that the verdict is without substantial evidence to support it. This answers the second point made by movants to the question of whether or not the evidence is substantial. This is the only question of law for determination under the motion herein made. If Pritchard had not seen the trailer truck actually move back and pin Cordle against the stone coping of the building, it might well be that the verdict could be said to lack substantial support and to rest on conjecture. But Pritchard, at the trial before Judge Bell[5] and in the present case, testified he "definitely saw the truck move back." This is not conjecture. It is a statement of fact. In the Court's opinion that

---

3. "The choice of conflicting versions of the way the accident happened, the decision as to which witness was telling the truth, the inferences to be drawn from uncontroverted as well as controverted facts, are questions for the jury." Dealer's Transport Co. v. Werner Transport Co., 8 Cir., 203 F.2d 549, 552.

4. Northern Pacific R. Co. v. Haugan, 8 Cir., 184 F.2d 472, 479; Dealer's Transport Co. v. Werner Transport Co., 8 Cir., 203 F.2d 549.

5. The Court will take judicial notice of its own records. Bowe-Burke Mining Co. v. Willcuts, D.C.Minn., 45 F.2d 394.

makes the evidence substantial enough to prohibit the trial court from ordering judgment for movants.

(3) Should a new trial be granted?

 The witness Alex Malszycki testified as follows:

"Q. And you say that you heard Cordle say that someone backed the truck into him? A. That's what he says."

The question makes obvious it called for repetition. The answer remained in the record. It was not objected to by plaintiff's counsel. It was not stricken. It was commented on by counsel in argument to the jury. There was no prejudice to Kelly or Gross under the circumstances.

The instant case was ably tried by counsel for movants. There was a complete and clear presentation of the evidence by lawyers of experience and fine repute. There was no unfairness indulged in at any time. The charge was comprehensive and fair. The case having been tried at the last term of court, prompted the Court to be cautious if anything. Res ipsa loquitur and presumption of care by decedent were not mentioned in the Court's charge.

The motions are denied. Movants may have an exception.