11 N.J. Super. 416 (1951)
78 A.2d 421
JACK YORMACK AND ANNA YORMACK, PLAINTIFFS-RESPONDENTS,
v.
FARMERS' COOPERATIVE ASSOCIATION OF NEW JERSEY, INC., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 11, 1950.
Decided January 22, 1951.
*418 Before Judges McGEEHAN, JAYNE and WM. J. BRENNAN, JR.
Mr. James S. Turp argued the cause for the appellant (Messrs. Turp & Coates, attorneys).
Mr. Baruch S. Seidman argued the cause for the respondents (Messrs. Burton & Seidman, attorneys).
The opinion of the court was delivered by JAYNE, J.A.D.
The factual circumstances of this litigation may be concisely stated. The plaintiffs have been engaged for a period of eight years at Dayton, New Jersey, in the raising and maintenance of chickens for the production of eggs for sale. The defendant is, as its corporate title implies, a farmers' cooperative association having its store and warehouse for the sale of agricultural supplies and related products at Hightstown, New Jersey. On Saturday, June 4, 1949, the plaintiffs visited the defendant's place of business to make some purchases. It is noted that they sought to *419 acquire for the pullets a vaccine for the prevention of fowl pox, a disinfectant powder for the nests of the layers, and a liquid insecticide for the roosts.
The plaintiffs testified that with respect to the last-mentioned article they asked the store clerk for "Black Leaf 40," and he replied that such was not then on hand but that he had "something cheaper and better" for the purpose for which they informed him they desired to use it. The clerk thereupon recommended and delivered to them a five-gallon can of a product known as "ICC Carbolineum." The plaintiffs declared that the can did not bear any label revealing the instructions for its use, and the clerk informed them that the contents could, if desired, be diluted with kerosene and could be most expeditiously applied by spraying. The plaintiffs thereupon also purchased a suitable sprayer.
On the following morning, Sunday, June 5, 1949, the plaintiffs' son sprayed the liquid on the roosts and on the tops of the nests in the four compartments of the coop, in which about 700 chickens, classified as layers, were confined. The chickens were kept in the coop during the process of spraying. The chickens were said to be then in a good state of health, and during Sunday they did not appear to be injuriously affected by their experience.
On Monday morning, June 6, 1949, the plaintiffs observed that "there was something wrong with them." It was noticed that their "wings drooped; their "eyes were swollen;' feathers had disappeared from the "necks and breasts" of several and the skin thus disclosed had an aspect of irritation. About 50 died during the course of the day, and some 357 died during the succeeding two weeks. The remaining layers (1,799 pounds) were in the emergency promptly sold for the best price obtainable.
The nature of the action instituted and prosecuted by the plaintiffs to recover compensatory damages for their alleged loss cannot properly be ignored. It is manifestly ex contractu and not ex delicto. The sole cause of action alleged is based on a breach of the statutory implied warranty of quality and fitness.
*420 "(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose." R.S. 46:30-21.
From an examination of the record, it would appear that the predominant issue entrusted to the jury for determination was whether the use of the carbolineum was the proximate and efficient cause of the loss of the chickens.
Counsel for the defendant at the close of the case made a motion "for the direction of a verdict," hence for judgment, in favor of the defendant, which was denied. The jury awarded the plaintiffs $2,500 damages.
On the record before us, the appellant has assigned three grounds for reversal, to wit, that the motion was erroneously denied; that the verdict was contrary to the weight of the evidence; and that there was a lack of evidence upon which damages could be measured.
We direct our attention to the defense. The salesman testified that the plaintiffs specifically asked for a can of carbolineum; that there was no discussion concerning its intended use; that the container bore a label; he denied that any representations were made by him relative to its quality or fitness for any purpose. He stated that no complaint was made to the defendant of its alleged injurious effects until June 14, 1949.
Other evidence disclosed that carbolineum is a distillate of coal tar, the main component of which is anthacine oil. It has been compounded and sold since the year 1879. It is at present prepared in this territory by Rockland Chemical Company of Newark, which company has over the period of the last 25 years sold approximately a half million cases of it to poultry breeders generally, and well over 15,000 gallons of it during the past year to poultry farmers in the State of New Jersey. It has long been approved by the United States Department of Agriculture as a specific for red mites. The *421 president of the Rockland Company testified that throughout his lengthy experience with the product he had never known it to cause the death of chickens.
An expert witness whose qualifications were impressive and who had engaged in research of poultry feeding in the States of New York, Connecticut and New Jersey imparted the information that "better than 50 per cent" of the poultrymen use carbolineum as an insecticide. He characterized the product as standard and efficient. Additionally, he enumerated several virus infections and respiratory diseases commonly contracted by chickens and which "generally strike very, very quickly." To some one of these he attributed the death of the plaintiffs' fowl.
It was conceded nevertheless that some few persons and some fowl may be allergic to such materials, and the Department of Agriculture under the provisions of the Insecticide Act required the Rockland Company to use the label bearing the inscription: "Caution: Avoid breathing vapors or fumes and avoid contact with skin." To those susceptible, the effect resembles a superficial burning of the skin similar to sunburn. It was acknowledged that if the skin of some chickens came in contact with the liquid, there might be evidence of a like irritation.
Such was the posture of the evidence at the close of the case. We perceive that several controversial issues of fact were projected, such as (1) did the plaintiffs expressly or by implication make known to the salesman of the defendant the particular purpose for which the material was required; (2) did the plaintiffs rely on the seller's skill or judgment; (3) was the material in fact reasonably fit for the purpose, if in truth the intended use was disclosed; (4) did the plaintiffs request and purchase the liquid under its trade name, in which event there was no implied warranty of its fitness for any particular purpose unless it arose by the usage of trade (R.S. 46:30-21 (4), (5)); and (5) what damages may reasonably be supposed to have been in the contemplation of the parties at the time of the making of the sale as a result of the breach of the implied warranty? Hadley v. Baxendale, *422 9 Exchq. R. 341; Wolcott, Johnson & Co. v. Mount, 38 N.J.L. 496 (E. & A. 1875); Iuliucci v. Rice, 130 N.J.L. 271 (E. & A. 1943).
The circumstances accompanying and surrounding the sale were certainly disputed matters of fact. If those elements of the alleged cause of action were resolved in favor of the plaintiffs, there were two additional controversial issues of importance. Was there a breach of the warranty? If so, was the breach the cause which naturally and probably led to and which may have been reasonably expected to produce the injurious result, or, phrased in the parlance of actions ex contractu, was the loss such as would fairly be considered as arising in the usual course of things or such as may reasonably be supposed to have been in the contemplation of the parties, at the time the contract of sale was made, as the probable result of a breach? Crater v. Binninger, 33 N.J.L. 513 (E. & A. 1869); Bonhard v. Gindin, 104 N.J.L. 599 (E. & A. 1928).
The uncontroverted proof disclosed that carbolineum has been compounded, sold in large quantities, and commonly used as a standard marketable insecticide particularly for the extermination of red mites by poultry owners without harmful consequences over a relatively lengthy span of years. Equally uncontradicted is the assertion that the liquid sold and delivered to the plaintiffs was carbolineum. There was no direct evidence that the contents of the particular can sold to the plaintiffs was composed of any foreign and extraneous ingredient of an exceptionally pernicious and destructive nature which if sprayed upon roosts and nests would in reasonable probability cause the death of chickens.
But it is argued that in the present instance the circumstances engendered the reasonable inference that the normal use of the carbolineum did in actuality cause the death of some and injuriously affect the health of the remainder of the plaintiffs' laying chickens; hence, it is insisted that there was in the present case evidentiary justification for the conclusion that the liquid was not reasonably fit for such use within the signification of the law.
*423 For example, it is a subject of common knowledge that Adam hats are popularly regarded and accepted generally as a satisfactory article of men's attire, yet in Zirpola v. Adam Hat Stores, Inc., 122 N.J.L. 21 (E. & A. 1939), we find a case in which in using one of the hats, the plaintiff's "hair, which was naturally black, had turned a reddish-orange color on each side of his head, and that he had a skin eruption on his forehead and the frontal region of the scalp * * *." The court stated: "The mere fact that only a small proportion of those who use a certain article would suffer injuries by reason of such use does not absolve the vendor from liability under the implied warranty created by the statute; otherwise, in every action to recover damages for the breach of an implied warranty, it would be necessary to show that the article sold, whether it be food or wearing apparel, would be injurious to every user. It is well known that many people are immune from certain poisons as well as contagious and infectious diseases, yet it could not be contended by reason thereof that a vendor selling an article infected with disease germs or containing a poisonous substance injurious to the user of the article, would not be liable under an implied warranty, unless it could be proved that injury would be the inevitable result of the use of such article."
It was concluded that whether there had been a breach of the statutory implied warranty was a matter of fact properly submitted to the jury for its determination, and the judgment for the plaintiff was affirmed.
Again, in Reynolds v. Sun Ray Drug Co., 135 N.J.L. 475 (E. & A. 1947), the appellant contended "that the statutory warranty is limited to a warranty that goods are reasonably fit for the purpose for which they are sold and that it cannot be said the goods are not reasonably fit for the purpose when only a small proportion of those who use a certain article are injuriously affected thereby. This court held to the contrary * * *."
We recognize the absence of any evidence which definitely informed the jury of the particular ingredient or constituent of the carbolineum which would in reasonable probability *424 gravely injure and kill the chickens. Proof of unfitness does not necessarily require that degree of exactness and precision. Tiedje v. Haney, 184 Minn. 569, 239 N.W. 611 (Sup. Ct. Minn. 1931); Ann. Cas. 1912 D, 775; Pietrus v. J.R. Watkins Co., 229 Minn. 179; 38 N.W.2d 799 (Sup. Ct. Minn. 1949). Indeed, the president of the company manufacturing carbolineum was asked: "What is it that causes that irritation?" He answered: "It is the substance itself." "And what is it in the substance that causes the irritation?" He replied, "That nobody knows."
Furthermore it was not necessary for the plaintiff to prove by direct evidence the causal relation between the use of the carbolineum and the injurious result; it could be established by circumstantial evidence.
"The plaintiff was not legally required to prove by positive testimony and with absolute certainty that the drinking of the water was the cause of the typhoid fever.
"The plaintiff satisfied the burden which the law imposed upon him by proving such facts and circumstances from which it was made to reasonably appear that the drinking of the water was the probable efficient cause of the typhoid fever." Jones v. Mount Holly Water Co., 87 N.J.L. 106, 112 (Sup. Ct. 1915).
There was testimony to which previous reference has been made that immediately prior to the spraying of the coops the chickens were normal; that on the following morning fifty were found dead and others "had their mouths open and were making whistling sounds;" many appeared to have been burned about the chest. The following excerpts from the testimony of the defendant's expert witness were illuminative:
"Q. What caused that burning?
"A. Coming in direct contact with the carbolineum on the roosts.
"Q. Whether it is caused by the fumes or whether as you say it would be by coming in contact with the carbolineum on the roosts, this substance would have a burning effect on the chickens?
"A. It may have on certain chickens.
"Q. Well, taking again the hypothesis based upon facts in this case, would you say that in this case knowing the burning which appeared *425 on these chickens, resulted from the application and use of this substance?
"A. It could have been.
"Q. You say it could have been. Will you go so far as to say that in all probability that it did?
"A. I would say that, yes."
There was but one other possible cause of the loss interjected. The evidence indicated the susceptibility of chickens suddenly to contract some type of the enumerated virus infections and respiratory diseases which in common knowledge is regarded as perhaps the principal hazard encountered in the pursuit of raising and maintaining chickens in large flocks. It was said by the expert that from such a cause the chickens would have manifested the same symptoms.
The requirement of circumstantial evidence in civil cases is that "The claimed conclusion from the offered fact must be a probable or more probable hypothesis, with reference to the possibility of other hypotheses." Cf. Jackson v. Delaware, L. & W.R.R. Co., 111 N.J.L. 487 (E. & A. 1933); Jochim v. Montrose Chemical Co., 3 N.J. 5 (1949).
"In civil cases it is sufficient if the circumstantial evidence be such as to afford a fair and reasonable presumption of the facts inferred. Circumstantial or presumptive evidence, as the basis for deductive reasoning in the determination of civil causes, is a mere preponderance of probabilities. * * * In the final analysis `probability, and not the ultimate degree of certainty is the test.'" Jochim v. Montrose Chemical Co., supra. Vide, Flexmir, Inc., v. Lindeman & Co., 4 N.J. 509 (1950).
Contrasting and evaluating logically permissible probabilities with regard to their qualities of comparative persuasiveness is the special function of the jury. Where fair-minded men may honestly differ as to the conclusion to be reached from the evidence, controverted or uncontroverted, the case must be submitted to the jury. Dobrow v. Hertz, 125 N.J.L. 347 (E. & A. 1940).
We accordingly conclude that the trial judge justifiably denied the motion.
*426 We nevertheless perceive merit in the appellant's remaining points.
Recognizing in the evidence the rapid succession and sequence of the events in point of time and ascribing due significance to the concession divulged by the witnesses of the defendant that carbolineum contains a component which in some instances will by its fumes temporarily disorder the respiration and if in contact with the skin will cause a slight burn, the jury might reasonably have inferred that the carbolineum proximately produced those consequences in the present case.
But we are unable to discover in the transcript any evidence, hypothetical or of any other character, which constituted a rational foundation for the inferential probability that the carbolineum would or could cause the death of man or fowl.
The award of $2,500 damages in contrast with the evidence of the plaintiffs' alleged loss conspicuously reveals that the jury assessed the defendant in damages not only for the fowl that died during the succeeding period of two weeks but for a sacrificial sale of the remainder of the flock which the plaintiffs apprehended would soon die, to which was super-added compensation for the complete interruption of the plaintiffs' enterprise for a period in the future.
In that respect, namely, the admeasurement of damages, the jury was manifestly influenced either by passion, sympathy, prejudice, or mistake. The power to confine a new trial to the question of damages is exercised with caution and only in those cases where it clearly appears that the improper inducements or impulses did not affect the other issues. Juliano v. Abeles, 114 N.J.L. 510 (Sup. Ct. 1935); Esposito v. Lazar, 2 N.J. 257 (1949).
In the present case the judgment is reversed and a new trial directed on all the issues in controversy.