Nelson **CHATFIELD**, d. b. a. Nelson's
Painting and Tree Service,
Respondent,

v.

**SHERWIN–WILLIAMS COMPANY,**
Appellant.

No. 47785.

Supreme Court of Minnesota.

April 14, 1978.

Rehearing Denied May 22, 1978.

Schneider & Neeser and Richard D. Beerling, Willmar, for appellant.

Hulstrand, Anderson & Larson and Ronald C. Anderson, Willmar, for respondent.

PER CURIAM.

In this action to recover damages allegedly resulting from breaches of warranty in the sale of red barn paint, the jury found by a special verdict that defendant paint manufacturer breached an express warranty that the paint was "good barn paint" and the implied warranties of merchantability and fitness for a particular purpose.[1] It also found that the breaches were a direct cause of plaintiff's damages; that plaintiff was negligent and his negligence was a direct cause of his consequential damages; that 85 percent of the fault causing such consequential damages was attributable to defendant and 15 percent to plaintiff; and that plaintiff sustained general damages of $1,116 and consequential damages of $13,357. The court ordered judgment for plaintiff for $14,473, the total amount assessed by the jury. Defendant appeals, challenging the sufficiency of the evidence to establish breaches of the warranties and that such breaches were a proximate cause of plaintiff's damages. Defendant also contends that plaintiff is precluded from recovery of damages because he did not follow defendant's directions in using its product. Our review satisfies us that the issues raised were properly submitted to the jury and that the judgment appealed from should be affirmed.

In the winter of 1974, plaintiff, an experienced professional painter of farm buildings, purchased 330 gallons of "Commonwealth Ranch Red" paint from defendant for $4.65 per gallon. Before making the purchase plaintiff asked Wendell Swenson,

---

[1]. Minn.St. 336.2–313 provides in part: "(1) Express warranties by the seller are created as follows:

"(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."

Section 336.2–314 provides in part: "(1) Unless excluded or modified (section 336.2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. * * *.

"(2) Goods to be merchantable must be at least such as

\* \* \* \* \* \*

"(c) are fit for the ordinary purposes for which such goods are used."

Section 336.2–315 provides: "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

manager of defendant's Willmar store, if it would be good paint and if he would have any trouble with it. Swenson told plaintiff that people had used this paint on barns for many years and, that it was "tried and true." He added, "Besides, this is Sherwin-Williams, you know. It couldn't have a bad name and be that big." Plaintiff then purchased the paint, used 240 gallons on barns and other buildings at 11 farms, and sold the rest to his father who is also a professional painter.

The label on the paint cans plaintiff purchased contained the following directions:

### "NEW WOOD AND EXTREMELY WEATHERED SURFACES:

Add 1 to 2 quarts of raw linseed oil per gallon to the *first coat.* Brush it well into surface. When spraying follow immediately with thorough brushing to work paint into pores. Second coat should be brushed on at package consistency or thinned with up to a pint of S–W exolvent or turpentine per gallon for spraying."

Plaintiff admitted that he never added as much as 1 to 2 quarts of linseed oil and said that when he used that much the paint wrinkled. He said that when painting dry areas, he added as much linseed oil as he thought necessary, depending on the condition of the wood. He thought a ratio of 20 percent was usually correct. He said that under the eaves and along the upper two-thirds of the buildings the wood is often in better condition than the wood below, the lower 5 or 6 feet of a barn usually requiring linseed oil. Plaintiff did not apply the paint with a brush, claiming that his spraying equipment made the paint penetrate into the surfaces far more thoroughly then brushing could.

Several customers testified that plaintiff spray-painted their buildings with Commonwealth Ranch Red during the summer of 1975. The buildings varied in age (from a barn built in 1906 to one built in 1965) and in their need for paint. The customers said they were well satisfied with plaintiff's work in preparing the surfaces and painting the buildings. Within 1 to 4 months after the jobs were completed, however, the owners noticed that the color was fading on their buildings. Witnesses said the surfaces looked chalky, the color continued to bleach, and the paint was chipping and could be rubbed off. Plaintiff testified that the buildings which his father had painted with the 90 gallons he had obtained from plaintiff also faded. After receiving complaints from his customers, plaintiff in turn made complaints to defendant which were ignored for several months. Finally, in April 1975, defendant sent George Linmark, a chemist employed by defendant, to investigate the matter. Linmark looked at the buildings plaintiff had painted on two farms and told him, plaintiff testified, that the wood had been well prepared and the paint well applied. Plaintiff testified that Linmark could not explain why the fading had occurred. Subsequently, plaintiff received a letter saying that defendant had decided to do nothing about the paint because the fading "was to be expected with that quality of paint."

Plaintiff admitted on cross-examination that he had read the instructions on the paint cans and had not added as much linseed oil as they directed. When plaintiff rested, defendant moved for a directed verdict on the ground that plaintiff's evidence showed no negligence on its part and showed that plaintiff had been negligent in using his judgment instead of the manufacturer's. The court denied the motion.

Defendant then called Linmark, a chemist with experience in formulating Sherwin-Williams paint, as an expert witness. He said that the 330 gallons of paint which plaintiff had bought was from a 3,000-gallon batch and that defendant had received no complaints about the rest of the batch. Although defendant stores a sample from each batch it manufactures, it did not test any sample from the batch which was the source of plaintiff's paint to see if it would fade, apparently because it was not clear at first which batch had been the source of plaintiff's purchase.

Linmark testified that paint has two essential ingredients, pigments and vehicles or binders. In Commonwealth Ranch Red, the pigment which gives the color is iron oxide, comprising 14 percent of the pigment, and most of the rest of the pigment is calcium carbonate, which by itself is a white powder but is colorless when added to the paint. The vehicle or binder holds the pigment and causes the paint to adhere to the surface of a building. The binder in defendant's paint consisted of tall oil alkyd resin, blown fish oil, mineral spirits, and raw linseed oil. In Linmark's opinion the fading was caused by insufficient reinforcement of the paint with more linseed oil. He said that on weathered surfaces some of the binder in the paint soaks into the wood or old paint if the new paint being applied is not reinforced with linseed oil, and that when the remaining binder is eroded by the ultraviolet rays of the sun, the pigment stands loose. Thus, he said, the calcium carbonate in Commonwealth Ranch Red became visible, giving the paint the appearance of fading.

Linmark also testified that paint wrinkles if applied too thickly and that linseed oil in any quantity does not cause wrinkling. He admitted telling plaintiff in April 1975 that he had done a good job and that in Linmark's opinion there was "a fade problem." He looked at only two of the sets of buildings plaintiff had painted and admitted that he did not know whether plaintiff had added enough linseed oil in the various jobs. He also said that the paint plaintiff purchased was "the bottom of the line."

In rebuttal, plaintiff's father, Robert Chatfield, testified that he used some of the 90 gallons he had acquired from plaintiff and that he too received complaints of fading. He added 1 quart of linseed oil to 5 gallons of paint while painting a barn for a customer and found that the paint became too thin and would run. He said he applied some of the paint to part of his own buildings without using any linseed oil and they also faded. He purchased other Commonwealth Ranch Red from defendant's Wilmar store himself and applied it to his buildings without adding linseed oil. He

said the areas to which he had applied this paint did not fade.

In submitting the case to the jury, the trial court refused to charge that defendant was not liable if plaintiff's use of the product was abnormal or not in accordance with adequate instructions. He instructed the jury that in determining whether plaintiff was negligent they could consider whether he used the paint in accordance with defendant's directions and submitted questions in response to which, as stated, the jury found plaintiff negligent and attributed 15 percent of the fault causing his consequential damage to that negligence.

1. Although apparently not contesting the existence of the warranties on which plaintiff brought suit, defendant argues that its motions for a directed verdict and for judgment notwithstanding the verdict should have been granted because plaintiff did not adduce sufficient proof that the paint faded prematurely because of an inherent defect and thus did not establish any breach of the warranties. It also argues that plaintiff did not prove that any breach of warranty proximately caused his damages, as is essential to recovery. *Heil v. Standard Chemical Mfg. Co.,* 301 Minn. 315, 323, 223 N.W.2d 37, 41 (1974). Defendant's contentions require an examination of plaintiff's evidence in the light most favorable to the verdict.

■ At the time defendant moved for a directed verdict, plaintiff had presented testimony that he had done a good workmanlike job, testimony which permitted the jury to infer that poor workmanship did not cause the fading. Plaintiff's proof also showed that some areas he had painted did not need linseed oil and that the paint had faded quite uniformly within 1 to 4 months after application, both in areas where he had used linseed oil and in areas where he had not. He admitted that he never added as much linseed oil as defendant's directions advised he should use with "extremely weathered" surfaces but said he added it in a ratio of 20 percent when he thought it was needed. He further testified that de-

fendant informed him that fading was to be expected with a paint of the quality of Commonwealth Ranch Red. This evidence, although it does not directly establish the cause of the fading, furnishes substantial support for the inference that the paint faded because of an inherent defect.

■ Defendant urges, however, that plaintiff was required to have the paint analyzed and to present expert testimony about the existence and nature of any alleged defect. Although the importance of expert testimony in products liability actions has been emphasized in several cases, this court has said that there is no hard-and-fast rule requiring plaintiff to introduce such testimony. *Peterson v. Crown Zellerbach Corp.,* 296 Minn. 438, 209 N.W.2d 922 (1973). In several earlier breach-of-warranty cases, chemical analysis of the product was not required to establish the breach of warranty. See, *Pietrus v. J. R. Watkins Co.,* 229 Minn. 179, 38 N.W.2d 799 (1949) (shampoo); *Tiedje v. Haney,* 184 Minn. 569, 239 N.W. 611 (1931) (cold tablets); *Wilson v. Goldman,* 133 Minn. 281, 158 N.W. 332 (1916) (hair dye). See, also, *Bark v. Dixson,* 115 Minn. 172, 131 N.W. 1078 (1911) (tainted meat).

In *Nelson v. Wilkins Dodge, Inc.,* Minn., 256 N.W.2d 472, 476 (1977), an action for breach of implied warranties in the sale of a pickup, the court held that a defective condition can be proved by circumstantial evidence, saying:

"Plaintiffs assert that there can be no question that proximate cause has been demonstrated with respect to the paint bubbles, the inverted taillight covers, and the loosened windshield-wiper blade and arm and shift lever. Defendant suggests that the paint bubbles and the loosened windshield wiper, horn bracket, and shift lever just as probably resulted from the continuous and hard use to which plaintiffs put the pickup as from any defect inhering in the vehicle when plaintiffs purchased it. Although liability for breach of warranty attaches only when a defect existing in the goods causes a breakdown in quality, * * * general-

ly no specific defect need be alleged, and a defective condition can be proved by circumstantial evidence. * * * No direct evidence was introduced as to the causes of the conditions in question. It is reasonable to suppose, however, that vehicles that are fit for ordinary purposes probably do not display these defects this early, even if they are driven a great deal within a short period of time. Thus, the causes of the faulty paint, windshield wiper, horn bracket, and shift lever were questions that should have been decided by the jury. A fortiori, the cause of the inverted taillight covers was a jury question."

Other courts have also held that circumstantial evidence may be sufficient to show the causal relation between the use of a warranted product and the injury which followed its use. See, 77 C.J.S. Sales, § 367. Thus, in *Yormack v. Farmers Co-op. Assn. of N. J.,* 11 N.J.Super. 416, 78 A.2d 421 (1950), in an action for breach of a statutory implied warranty of quality and fitness in the sale of an insecticide (carbolineum) for use about chicken roosts, the court said (11 N.J.Super. 423, 78 A.2d 424):

"We recognize the absence of any evidence which definitely informed the jury of the particular ingredient or constituent of the carbolineum which would in reasonable probability gravely injure and kill the chickens. Proof of unfitness does not necessarily require that degree of exactness and precision. * * *

"Furthermore it was not necessary for the plaintiff to prove by direct evidence the causal relation between the use of the carbolineum and the injurious result; it could be established by circumstantial evidence."

We conclude that although plaintiff's proof of causation was not direct, if his evidence is viewed in the light most favorable to the verdict, the jury could infer from the fact that the fading was quite uniform that the presence or absence of linseed oil had no effect on the fading. Defendant admitted that there was a "fade problem" and fading within so short a time

was to be expected with Commonwealth Ranch Red. From this it could be inferred that it was not "good barn paint," not of merchantable quality, and not suitable for the purpose for which plaintiff bought it. Thus, defendant's motions for a directed verdict and for judgment notwithstanding the verdict were properly denied.

■ 2. Defendant also argues that, assuming the warranties involved here were breached, plaintiff is precluded from recovery of damages because he used the paint contrary to the directions and such "misuse" was beyond the scope of the warranties. Although defendant cites several cases in support of this claim—*Chisholm v. J. R. Simplot Co.,* 94 Idaho 628, 495 P.2d 1113 (1972); *Elanco Products Co. v. Akin-Tunnell,* 516 S.W.2d 726 (Tex.Civ.App.1974); *Iverson Paints, Inc. v. Wirth Corp.,* 94 Idaho 43, 480 P.2d 889 (1971); *Brown v. General Motors Corp.,* 355 F.2d 814 (4 Cir. 1966)—all are distinguishable from this case. In the *Chisholm* case, watering the fields within a specified time was essential to activate the weed killer which was alleged to have been defective, and the importance of following that direction should have been obvious to plaintiffs. In *Iverson* also, the directions for using the machine were very precise, and they were almost completely ignored—neither of which is the fact here. In the *Elanco* case the manufacturer had stressed the necessity of following directions and had disclaimed any affirmations made about the product unless the directions were followed. The court accordingly treated compliance with the directions as a condition precedent to the existence of the express warranty sued on. Here no comparable stress was laid on the importance of the directions, and they certainly were not specific and precise as to quantity. In *Brown,* plaintiff did not establish that there had been a breach of warranty, and that his use of a tractor by starting it when it was in gear was abnormal and unpredictable. Plaintiff used the paint here for its intended purpose.

■ We conclude that the trial court correctly instructed the jury that it could consider whether plaintiff complied with defendant's directions in determining whether he was negligent and whether his negligence was a cause of his consequential damages.

■ We also find little merit in defendant's argument that, if there was a defect in the paint, plaintiff failed to mitigate his damages by continuing to use the paint after he found it wrinkled when combined with the prescribed amount of linseed oil. Plaintiff did not know the paint would fade because, as he thought, defendant's directions called for too much linseed oil. Defendant's argument also assumes that plaintiff was at all times required to add linseed oil, a conclusion not compelled by the evidence. In any event, the court properly instructed the jury on plaintiff's duty to mitigate damages after learning of the breaches of warranty.

■ Defendant urges, finally, that the trial court improperly awarded plaintiff all of the consequential damages assessed by the jury and argues that these damages should have been reduced by 15 percent to reflect the proportion of fault which the jury attributed to plaintiff's negligence. Whether a comparative-fault principle should be applied in breach-of-warranty actions has not been determined in this state. *Wenner v. Gulf Oil Corp.,* Minn., 264 N.W.2d 374, filed February 17, 1978. Although reducing a party's consequential damages by an amount reflecting the extent to which his own conduct caused them appears to be equitable, appropriate under Minn.St. 336.2–715(2)(b), and compatible with our approach in a recent products liability action based on strict liability, *Busch v. Busch Const. Co.,* Minn., 262 N.W.2d 377 (1977), we decline to consider this issue since it was not presented to the trial court and has been raised for the first time on appeal. *International Union of Operating Eng. v. City of Mpls.,* 305 Minn. 364, 233 N.W.2d 748 (1975).

Affirmed.

OTIS, J., took no part in the consideration or decision of this case.