INTERNATIONAL FINANCIAL
SERVICES, INC., Plaintiff,

v.

Allen J. FRANZ, et al., defendants and
third-party plaintiffs, Respondent,

v.

GERBER SCIENTIFIC INSTRUMENT
CO., third-party defendant,
petitioner, Appellant.

No. C5–93–1550.

Supreme Court of Minnesota.

July 7, 1995.

Jeffrey W. Lambert, Lee R. Bissonette, Lambert & Boeder, Wayzata, and David F. Herr, Cooper S. Ashley, Maslon, Edelman, Borman & Brand, Minneapolis, for appellant.

Rodney J. Mason, Chandler and Mason, Ltd., St. Paul, and Thomas B. Olson, Olson, Usset, Agan & Weingarden, Edina, and Eric J. Magnuson, Karen I. Johnson, Rider, Bennett, Egan & Arndel, Minneapolis, for respondent.

## OPINION

COYNE, Justice.

In this action for breach of warranty we review a decision of the court of appeals on the petition of third-party defendant The Gerber Scientific Instrument Company. The court of appeals affirmed the jury's determination that the repair or replacement remedy provided in the agreement for the purchase of a Gerber Model 3235 photoplotter system had failed of its essential purpose. *International Fin. Serv., Inc. v. Franz,* 515 N.W.2d 379 (Minn.App.1994). However, the court of appeals vacated an award of incidental damages, reinstated the claim for consequential damages, and remanded for retrial of the damages claims of the defendants and third-party plaintiffs Allen J. Franz and Franz Engineering Reproductions, Inc., and directed that on remand there was to be a determination of the amount of incidental damages sustained by Franz and whether or to what extent consequential damages should be awarded. *Id.* at 387–88. We affirm in part and reverse in part.

This action was commenced in January 1987 by International Financial Services Corporation (IFS) to collect the unpaid balance due pursuant to a lease of a New Gerber Model 3235 Photoplotter System and for recovery of the equipment described in the lease agreement. Franz interposed an answer and counterclaim and a third-party complaint against Gerber. IFS was awarded summary judgment in the amount of $391,-

071.10 and also possession of the leased Gerber Model 3235 Photoplotter System on March 13, 1987.

The IFS judgment was not appealed, and we are here concerned only with the third-party action in which Franz asserts claims of breach of warranty and failure of limited remedies contained in the purchase agreement between Gerber and Franz, seeking consequential and incidental damages as well as damages sustained by reason of the equipment lease agreement with IFS.

In the early 1980s, in response to demand from the computer manufacturing industry, Gerber designed and produced a photoplotting system which produced a negative for use in the manufacture of circuit boards. In the late fall of 1984 John Daniels, a Gerber sales representative, called on Allen Franz, the president and sole shareholder of Franz Engineering Reproductions, Inc., a company engaged in the reproduction of circuit boards.

Franz did not then purchase a Gerber system, but a few months later, in March 1985, Daniels submitted a proposal which provided profit projections as well as cost figures for and other information about two models of the Gerber photoplotting system. The proposal also included performance specifications and installation considerations applicable to the two models. Model 3241 produced photoplots to a tolerance of plus or minus .001 inch. Model 3235 was designed to meet much more stringent accuracy requirements—with variances limited to plus or minus .0002 inch. The proposal set the price of Model 3241 at $89,370 with a 12–month service contract at an additional $11,360. The Model 3235 was much more expensive: $299,165 plus a 1–year service contract at $25,200. The performance specifications contained in the proposal included the information that the performance specifications of Model 3235 were based on an ambient temperature of 68 degrees Fahrenheit and a relative humidity of 50 percent; the amount of error resulting from the thermal variation per Fahrenheit degree was also given. The installation considerations included in the proposal stated that Model 3235 was designed to operate continuously in an environment maintained at a constant temperature set between 60 and 80 degrees Fahrenheit and relative humidity fixed between 40 and 60 percent.

Later that spring another Gerber sales representative, Marla Giordano, called on Mr. Franz. Like Daniels, Giordano recommended the purchase of Model 3235, and she characterized as realistic Daniels' projected net profitability of Model 3235 at about $17,000 per month. On June 3, 1985 Giordano submitted a new proposal for Model 3235 at a lower price: $290,780 plus a 12–month service contract at $24,785.

Franz declined to purchase the system at that time, but he conducted a market survey over the next several months from a list of potential customers provided by Giordano. On August 2, 1985 Franz entered into an agreement to purchase a Model 3235 photoplotter system; the purchase price was $276,241 plus a 12–month service contract at $24,785. Toward the end of August Franz received Gerber's facility planning guide which provided information concerning the temperature and humidity requirements and warned of the dangers of power surges. There was a specific notation in the guide that although the photoplotter would operate at any fixed temperature between 60 and 80 degrees Fahrenheit, the stringent tolerance specifications were developed with equipment operated in an environment continuously maintained at 68 degrees Fahrenheit. In order to provide the controlled environment required for high accuracy photoplotting, Franz contracted with Clean Air Systems for the construction of a "clean room."

During the negotiations for the purchase of the photoplotter, Giordano had told Franz that it could take up to 6 months for delivery, but by letter dated August 26, Gerber informed Franz that its Model 3235 was scheduled for shipment on October 30. Because construction of the clean room was not completed, Franz asked that shipment be delayed until November 14, 1985. Gerber acceded to the request, and when the equipment arrived in Minneapolis in November, it was stored in a warehouse. On January 21, 1986 the Model 3235 was taken out of storage and placed in the still unfinished clean room.

It was close to the end of February when the clean room was completed, and during the week of March 3, 1986 Gerber employee David Levesque began the installation of the Model 3235. His initial inspection of the equipment disclosed two tripped impacto-graphs, which indicated that the 3235 system had been dropped or in some other way handled harshly, and he so informed the Franz photoplotter operator. Although the purchase agreement provided that title and all risk of loss and damage passed to the buyer on delivery to a common carrier F.O.B. at Gerber's plant, Mr. Franz pro-fessed ignorance of the conditions under which the equipment had been stored from its arrival in Minneapolis to January 21, 1986 when it was placed in the unfinished clean room. By March 6, however, the 3235 sys-tem operated according to specifications, so Levesque signed the final acceptance form and left it with the expectation that Mr. Franz would sign and transmit the form to Gerber.

Franz immediately encountered both ma-jor and minor shifts in its photoplots. The major shifts ceased when Gerber replaced the photohead of the Model 3235, but the minor shifts continued to plague Franz. On March 31 Gerber sent Ron Larsen, the pro-ject manager of the Model 3235 system, to Franz to determine the reason for the minor shifts in Franz' photoplots. His inspection revealed that the table of the Model 3235 was expanding and contracting with temperature variations. During Larsen's 5–day stay at Franz, the air conditioning unit serving the clean room froze. According to Larsen the air conditioner repairman considered the air conditioning system inadequate and he pre-dicted periodic freezing up because of fluctu-ations in the outdoor temperature. Larsen was of the opinion that temperature varia-tions were the cause of the minor shifts, but he said that the machine was plotting accu-rately when he left Franz.

Franz never could achieve the high-accura-cy photoplots promised by the tolerance specifications for Model 3235 and, therefore, could not attract a clientele requiring ex-tremely accurate photoplotting. Franz ob-tained only less profitable work which per-mitted a broader tolerance.

Although Gerber continued to respond to Franz' request for service, the Model 3235 was occasionally out of service. Because the system did not produce photoplots of the anticipated high degree of accuracy and be-cause of the down time, the Model 3235 did not generate enough revenue to cover the expense of operation, and Franz fell behind in its lease payments. In December 1986 Gerber refused to take back the Model 3235 or to refund the purchase price. As a result of Franz' default IFS accelerated the balance of the lease, demanded return of the leased equipment, and early in January 1987 sued both Franz Engineering, the lessee, and Al-len Franz, who had personally guaranteed the lease.

While the main action was quickly dis-posed of by summary judgment, the third-party action was tried to a jury. Prior to trial the trial judge ruled that both Franz and Gerber are merchants and that their transaction and the remedies in the event of breach of contract are governed by Minneso-ta's version of the Uniform Commercial Code.

The purchase agreement into which the parties entered on August 2, 1985, included Gerber's standard terms and conditions of sale, which sets out the seller's warranty, limits the buyer's remedy, and excludes con-sequential damages:

*Warranty*

GSI warrants the equipment to be free from defects in material and workmanship. This warranty shall become effective upon completion of installation at Buyer's facili-ty, but in no case later than thirty (30) days after delivery to Buyer's facility. Any delay in completion of installation be-yond thirty (30) days after receipt at Buy-er's facility caused by Buyer not having the facility ready on the agreed date shall reduce the warranty period by a period equivalent to such delay. This warranty shall be for a period of ninety (90) days or five hundred hours of operating time, whichever shall first occur, for labor and non-expendable parts.

GSI's liability and Buyer's remedy under the warranty will be limited to the repair and/or replacement at GSI's election of materials determined by GSI to be defective or non-conforming.

\* \* \* \* \* \*

The foregoing warranty is in lieu of all other warranties expressed or implied, and of all obligations or liabilities on the part of GSI for damages, including but not limited to consequential and/or special damages arising out of. or in connection with the use or operation of the equipment sold or leased by this Agreement. In no event shall GSI be liable for damages of any kind or nature resulting from improper or negligent use or operation of the equipment sold or leased hereby or in the event that said equipment has been altered or repaired by personnel other than those in the employ of GSI or authorized in writing by GSI to repair said equipment.

THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE DESCRIPTION THEREOF AS HEREIN SET FORTH.

Although there seems never to have been any dispute that the Model 3235 sold to Franz operated according to specification when it left Gerber's plant F.O.B. in Hartford, Connecticut, the parties sharply disputed the cause of Franz' inability to produce photoplots meeting the system's highest specification. Franz contended the cause was some unidentified defect in the system, Gerber's project manager for the Model 3235 system, Larsen, blamed the minor shifts on temperature variations, and Franz' expert, Dale Yingling, testified that the number and variety of service problems was "very excessive" and that the amount of service required was "very unusual" and "very untypical of a Gerber system."[1] The testimony about the amount of down time Franz experienced because of service problems with the Model 3235 was in acute conflict.

There was testimony from IFS's president that sometime in the fall of 1986, Gerber's regional sales manager remarked that the Franz Model 3235 was a "lemon." Gerber denied that the system sold to Franz was a "lemon."

Before the case was submitted to the jury the trial judge concluded that Gerber expressly warranted the Model 3235 to be free from defects in material and workmanship and that although the warranty set out in the purchase agreement effectively disclaimed an implied warranty of fitness for a particular purpose, it was not effective as a disclaimer of the implied warranty of merchantability. The trial court also ruled that the agreement limited Franz' remedies for breach of contract to repair and replacement and that consequential damages were excluded by the agreement.

By special verdict, the jury found that while Gerber did not breach its express warranty of freedom from defects in material or workmanship, it did breach the implied warranty of merchantability, that the breach had not been remedied by repair or replacement, and that the limited remedy of repair and/or replacement had failed of its essential purpose. The jury awarded Franz difference-in-value damages in the amount of $216,000 and incidental damages of $618,000. The trial court awarded Franz prejudgment interest from January 29, 1987 when the third-party action was commenced,[2] and judgment against Gerber in the amount of $1,127,110.44 was entered on July 13, 1993.

On Gerber's appeal the court of appeals vacated the $618,000 award for incidental damages because a portion of the incidental damages represented the cost of Franz' financing arrangements and were not damages resulting from the breach. *International Fin. Serv.*, 515 N.W.2d at 387–88. The court of appeals remanded for redetermination of incidental damages and for a determination whether consequential damages, including

---

1. Yingling suggested that power surges were a possible explanation for the minor shifts. He also testified that Gerber lived up to its repair or replacement warranty, fixing all but the minor shifts.

2. The trial court ruled, however, that incidental damages of $177,000, representing interest on the IFS judgment, were not subject to an award of prejudgment interest.

foreseeable lost profits, should be awarded. *Id.*

■ Gerber contends that Franz' entire action fails for lack of proof—that Franz produced no evidence that the problems encountered with Franz' Model 3235 photoplotter were proximately caused by defects in the equipment or anything else for which Gerber was responsible. Certainly, Minnesota has long recognized that mere proof of a breach of the warranty of merchantability is not enough to sustain an action for breach of warranty and that the plaintiff must show not only the breach but also a causal relationship between the breach and the loss sustained. *Peterson v. Bendix Home Sys., Inc.,* 318 N.W.2d 50, 52–53 (Minn.1982); *Heil v. Standard Chemical Mfg. Co.,* 301 Minn. 315, 323–24, 223 N.W.2d 37, 41–42 (Minn.1974). Nevertheless, this court has held that "generally no specific defect need be alleged, and a defective condition can be proved by circumstantial evidence." *Nelson v. Wilkins Dodge, Inc.,* 256 N.W.2d 472, 476 (Minn. 1977). Moreover, circumstantial evidence may be sufficient to show the causal relationship between the product and the injury which followed its use. *Chatfield v. Sherwin–Williams Co.,* 266 N.W.2d 171, 175 (Minn.1978).

■ Gerber contends that Franz has failed to prove causation because it is undisputed that the Model 3235 shipped to Franz operated according to specifications when it left Gerber's plant F.O.B. and the risk of loss shifted to Franz and that Yingling, Franz' expert witness, testified that power surges or fluctuations in temperature or humidity were possible causes of the minor shifts in the Franz photoplots. Nevertheless, we are of the opinion that, although there may not be evidence of a specific defect which caused the minor shifts, the cumulative circumstantial evidence is sufficient to take the inference of causation out of the realm of speculation.

Pursuant to the terms of the contract, Gerber employees installed the Model 3235 at Franz' facility in March 1986. There was testimony that the installation took a good

deal longer than Franz anticipated, and Gerber's installation technician conceded it was a "problem installation." During the two or three weeks the equipment was in operation, the photoplots exhibited major and minor shifts. When Gerber replaced the photohead,[3] the major shifts ceased, but Franz continued to encounter minor shifts.

Gerber's Model 3235 project manager, Ron Larsen, testified that when he left Franz' facility after replacement of the photohead the machine was plotting properly. There was, however, testimony that five of the 13 photoplots Larsen ran failed to meet specifications. To operate its Model 3235 Franz engaged Chris Trusinsky, who had been identified by Gerber as an operator experienced in the operation of a similar machine. Trusinsky testified that there never was a time during the time he operated the Franz Model 3235 that he could consistently achieve photoplots within Gerber's specified tolerance limits of the Model 3235.

As mentioned earlier, testimony with respect to the amount of time the Model 3235 was out of service varied significantly—from a Franz manager's estimate that the photoplotter was down 44 percent of the time to Gerber's Model 3235 project manager's calculation that total down time was 10 percent, which he considered not unusual for the first year of operation. Franz' expert, Yingling, testified that even after taking into consideration possible temperature and humidity variations and possible power surges, potential freeze-up of the air conditioning unit, and the potential harm indicated by the tripped impactographs, he regarded the remaining 10 service problems "extremely excessive." He said the amount of service required was "very unusual" and that the amount of down time (25 percent) was unacceptable and "very untypical of a Gerber system," which was normally available 96 percent of the time.

Gerber, on the other hand, attributed the minor shifts in the photoplots to temperature and humidity fluctuations and surges of electrical power. There was testimony, however,

---

3. Although the risk of loss had shifted to Franz when the Model 3235 was placed F.O.B. in South Windsor, Connecticut, and although two impactographs had been tripped before the equipment was installed, Gerber replaced the photohead without charge to Franz.

that the Gerber regional sales manager called the Franz Model 3235 a "lemon," while the Gerber project manager testified that it was "absolutely not a lemon."

> As we have said on previous occasions: It is well settled that we will set aside an answer to a special verdict question only when it is perverse and palpably contrary to the evidence. * * * The issue of causation is for the jury to decide, and its decision will stand unless manifestly contrary to the evidence viewed as a whole and in the light most favorable to the verdict.

*Hauenstein v. Loctite Corp.*, 347 N.W.2d 272, 275 (Minn.1984) (citations omitted). Based on the evidence here, viewed as a whole, the jury could have properly concluded that Gerber breached the implied warranty of merchantability to Franz' damage and that its failure to provide by repair or replacement a Model 3235 which would "pass without objection in the trade under the contract description" and be "fit for the ordinary purposes for which such goods are used" amounted to a failure of the essential purpose of the limited remedy prescribed by the contract. *See* Minn.Stat. § 336.2–314(2)(a), (c) (1994).

 The effect of the failure of a limited remedy to meet its essential purpose presents a most vexing problem that has plagued courts ever since the adoption of the Uniform Commercial Code.[4] Most of the early cases declared that when a limited remedy failed of its essential purpose, a consequential damages exclusion became unenforceable. *See, e.g., Riley v. Ford Motor Co.*, 442 F.2d 670, 673 (5th Cir.1971) (applying Alabama Code). In 1972 in their hornbook entitled *Uniform Commercial Code*, James J. White and Robert S. Summers, two respected commenta-

tors on the U.C.C., urged that conclusion. *Id.* at 379–80. When, however, the transaction is between merchants, more recent cases give effect to a contractual limitation of liability for consequential damages regardless of the failure of the exclusive remedy of repair or replacement to achieve its essential purpose. A leading case setting out the rationale for excluding consequential damages in such circumstances is *American Elec. Power Co. v. Westinghouse Elec. Corp.*, 418 F.Supp. 435 (S.D.N.Y.1976). First, the court concluded that there was no reason to disturb the consensual allocation of business risk embodied in the parties' contract. Relying on *County Asphalt, Inc. v. Lewis Welding & Eng'g Corp.*, 323 F.Supp. 1300 (S.D.N.Y. 1970), *aff'd*, 444 F.2d 372 (2d Cir.), *cert. denied*, 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (1971), the court recognized the continued viability of the limitation of remedies for breach in these words:

> [W]here an exclusive remedy (such as a warranty to repair or replace) fails of its essential purpose, it may be ignored, and other clauses in the contract which limit remedies for breach may be left to stand or fall independently of the stricken clause.

*American Elec.*, 418 F.Supp. at 458. The court went on to say that since it could not be said that the clause excluding liability for consequential damages was unconscionable, it had to be given effect. In a footnote the court pointed out that unconscionability rarely exists in a commercial setting involving parties of relatively equal bargaining power. *Id.* at n. 41.

Like the contract between Franz and Gerber, the contract between American Electric and Westinghouse was not of a kind entered

4. Minn.Stat. § 336.2–719 (1994) provides as follows:

 (1) Subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitation of damages,

 (a) the agreement may provide for remedies in addition to or in substitution for those provided in this article and may limit or alter the measure of damages recoverable under this article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and

 (b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

 (2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this chapter.

 (3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

into by the average consumer but a commercial agreement. That the commercial risk allocation provided by the contract be left undisturbed seemed to the *American Electric* court particularly appropriate where "the warranted item is a highly complex, sophisticated, and in some ways experimental piece of equipment." *Id.* Although the Gerber Model 3235 photoplotter cannot be equated with the Westinghouse turbine generator at issue in *American Electric*, there can hardly be any doubt that the photoplotter is a highly complex, sophisticated, and in some ways, perhaps, an experimental piece of equipment.

Relying on such cases as *Riley v. Ford Motor Co.*, 442 F.2d 670 (5th Cir.1971), and *Adams v. J.I. Case Co.*, 125 Ill.App.2d 388, 261 N.E.2d 1 (1970), American Electric, the buyer of the unsatisfactory Westinghouse turbine generator, contended that the warranty of repair or replacement and the exclusion of consequential damages were dependent provisions and that if the remedy of repair or replacement failed of its essential purpose, U.C.C. § 2–719(2) extinguished the contractual exclusion of consequential damages. *American Elec.*, 418 F.Supp. at 456. Westinghouse apparently responded to that argument simply by pointing out that its consequential damages exclusion was independent of its warranty because the former appeared in a section of the contract entitled Limitation of Liability while the repair or replacement remedy appeared in a section entitled Guarantee. In support of its position Westinghouse cited *V–M Corp. v. Bernard Distrib. Co.*, 447 F.2d 864 (7th Cir. 1971), and *County Asphalt, Inc. v. Lewis Welding & Eng'g Corp.*, 323 F.Supp. 1300 (S.D.N.Y.1970), *aff'd*, 444 F.2d 372 (2d Cir.), *cert. denied*, 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (1971).

Adopting the interpretation of U.C.C. § 2–719(2) urged by Westinghouse, the court distinguished the cases in which repair or replacement and consequential damage exclusions were regarded as inseparable, noting the specific separation of the two provisions in the contract. *American Elec.*, 418 F.Supp. at 457–59.

The physical separation of the repair and replacement provision and the consequential damage provision is often noted in discussions of the *American Electric* opinion, but in one of the first cases to follow the lead of *American Electric*, the court did not even remark that in the contract before it, the repair or replacement warranty and the limitation of liability for damages were lumped together in a paragraph entitled Warranty. *See S.M. Wilson & Co. v. Smith Int'l, Inc.*, 587 F.2d 1363, 1366 n. 2 (9th Cir.1978).

Two years after the decision in *American Electric*, the United States Court of Appeals for the Ninth Circuit ruled that a contractual bar to recovery of consequential damages was not destroyed by the failure of the essential purpose of the limited warranty of repair or replacement where the seller had unsuccessfully attempted to repair a tunnel boring machine. *Id.* at 1375. Having observed that parties of relatively equal bargaining power had allocated the risk of loss from consequential damages to the buyer and that the seller had tried to repair the complex machine but simply could not cure the problems encountered, the Circuit Court ruled that the seller should not be required to absorb the losses the buyer had agreed to bear. The court went on to explain its decision in these words:

> Risk shifting is socially expensive and should not be undertaken in the absence of a good reason. An even better reason is required when to so shift is contrary to a contract freely negotiated. The default of the seller is not so total and fundamental as to require that its consequential damage limitation be expunged from the contract.

*Id.*

The next case which dealt in detail with the fate of an exclusion of consequential damages directly addressed the tension between U.C.C. §§ 2–719(2) and 2–719(3), enacted as N.J.Stat. §§ 12A:2–719(2) and 12A:2–719(3). *Chatlos Sys., Inc. v. National Cash Register Corp.*, 635 F.2d 1081, 1085–86 (3d Cir.1980).

> It appears to us that the better reasoned approach is to treat the consequential damage disclaimer as an independent provision, valid unless unconscionable. This poses no logical difficulties.

*Id.* at 1086 (footnote omitted). The basis for the court's conclusion appeared in the succeeding paragraph:

> The limited remedy of repair and a consequential damages exclusion are two discrete ways of attempting to limit recovery for breach of warranty. [Citations omitted.] The Code, moreover, tests each by a different standard. The former survives unless it fails of its essential purpose, while the latter is valid unless it is unconscionable. We therefore see no reason to hold, as a general proposition, that the failure of the limited remedy provided in the contract, without more, invalidates a wholly distinct term in the agreement excluding consequential damages. The two are not mutually exclusive.

*Id.* (citations omitted) (footnote omitted).

In 1987 the New Jersey Supreme Court reviewed a large number of cases on each side of this issue and followed the *Chatlos* rationale, saying:

> We are also persuaded that many routine business transactions would be dislocated by a rule requiring the invalidation of a consequential damage exclusion whenever the prescribed contractual remedy fails to operate as intended.

*Kearney & Trecker Corp. v. Master Engraving Co.,* 107 N.J. 584, 527 A.2d 429, 437 (1987).[5]

Other cases illustrative of the current trend to characterize the repair or replacement remedy and a consequential damage exclusion as discrete and independent provisions are *McKernan v. United Technologies Corp.,* 717 F.Supp. 60 (D.Conn.1989); *Schurtz v. BMW of North America, Inc.,* 814 P.2d 1108 (Utah 1991); *Envirotech Corp. v. Halco Eng'g, Inc.,* 234 Va. 583, 364 S.E.2d 215 (1988); all of which explore the issue in some detail.

We too are of the opinion that the better reasoned approach is to treat the repair or replacement remedy and a consequential damage exclusion as discrete and independent contractual provisions. Accordingly,

the consequential damage exclusion is valid unless it is unconscionable. Under the circumstances of this case, where the parties were both merchants and there was no great disparity in their bargaining strength and where the claim is for commercial loss, there is nothing that makes it unconscionable to enforce the allocation of risk incorporated into the parties' contract. The consequential damages exclusion is valid and enforceable.

We are well aware that courts are deeply divided on this issue and that about the same number of cases can be marshalled on either side of the question. We are persuaded, however, that the line of cases introduced by *American Electric* is the better reasoned and adheres most closely to the general purpose of the U.C.C.—to permit the parties to make their own agreement. Minn.Stat. § 336.1–102 (1994). We also agree with White and Summers' observation that when the state intervenes to allocate the loss, it is "more likely that the loss will fall on the party who cannot avoid it at the lowest cost." 1 James J. White and Robert S. Summers, *Uniform Commercial Code* 605 (3d ed. 1988).

We emphasize, however, that our decision is grounded in a commercial setting involving a contract between two merchants of relatively equal bargaining power and is not intended to establish that a consequential damage bar survives a failure of the limited repair remedy in consumer transactions that involve relatively commonplace or uncomplicated products such as automobiles and trucks. *See Canal Elec. Co. v. Westinghouse Elec. Corp.,* 406 Mass. 369, 548 N.E.2d 182, 186 (1990). We anticipate that such consumer transactions will continue to be governed by the principles enunciated in *Jacobs v. Rosemount Dodge–Winnebago South,* 310 N.W.2d 71 (Minn.1981), and *Durfee v. Rod Baxter Imports, Inc.,* 262 N.W.2d 349 (Minn. 1977).

■ Although we agree with the trial court that the consequential damage exclusion effectively barred claims for such dam-

---

5. Master Engraving, a sophisticated buyer, purchased a computer-controlled machine tool for $167,000. It was a complex piece of equipment whose normal operation could be adversely af-

fected by a wide variety of factors, some of which were the buyer's responsibility. *Kearney,* 527 A.2d at 438.

ages, we believe the trial court erred in denying Franz the opportunity to prove damages resulting from the construction of the "clean room." In cases of breach of warranty the cost of putting the offending product in place is a direct damage. *Kleven v. Geigy Agric. Chem.*, 303 Minn. 320, 227 N.W.2d 566 (1975); *see also Despatch Oven Co. v. Rauenhorst,* 229 Minn. 436, 40 N.W.2d 73 (1949).

Here the seller instructed the buyer that the Model 3235 photoplotter must be housed in a facility capable of maintaining temperature and humidity under strict control, necessitating the construction of a "clean room." Although Gerber performed the actual installation of the photoplotter as a part of the purchase price, the cost of construction of housing for the photoplotter was, in a sense, part of the cost of the machine and whatever damages accrued with respect to that construction are damages "resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." Minn.Stat. § 336.2–714(1) (1994). This does not mean that the cost of construction is the measure of such direct damages, for it is only the difference between the construction cost and the value of the facility despite the breach. Inasmuch as a facility in which temperature and humidity are under strict control is desirable for housing many types of high technology equipment, it seems likely the "clean room" had some value in spite of the failure of the Model 3235.

The record discloses the construction cost, but because that item was treated at trial as an element of consequential damages and, therefore, inadmissible, there is no evidence with respect to the benefit conferred on Franz by reason of the construction. Consequently, reluctant though we are to prolong this already protracted litigation, we remand for determination of the damages, if any, sustained with respect to the preparation of the "clean room" as a result of the breach of the implied warranty of merchantability.

Finally, we agree with the court of appeals that the damages related to financing the purchase of the Model 3235 are outside the customary realm of incidental damages. It seems to us, however, that there can be no basis for awarding such damages in this case. An award of the amount paid on the lease obligation together with the unpaid balance of the lessor's judgment and the interest on the lessor's judgment represents more than double recovery, measured in terms of the difference in value of the Model 3235 sold to Franz and the value it would have had *if it* had been as warranted. Moreover, the seller is usually not responsible for costs associated with the buyer's financial arrangements or condition. *See Lovejoy v. Morrison,* 10 Minn. 136 (Gil. 108) (1865). If such damages are recoverable at all, they are recoverable as consequential damages. *See City Nat'l Bank of Charleston v. Wells,* 181 W.Va. 763, 384 S.E.2d 374, 384–85 (1989); *see also ACME Pump Co. v. National Cash Register Co.,* 32 Conn.Supp. 69, 337 A.2d 672, 677 (Conn.C.P.1974). While the trial court may properly award preverdict interest from the date of commencement of the third-party action, such an award is subject to the provisions of Minn.Stat. § 549.09 (1994). Therefore, we affirm the court of appeals' reversal of the $618,000 incidental damage award, but reverse as to remand in view of our decision that the costs associated with Franz' financing arrangements were not incurred incident to the breach.

Reversed in part, affirmed in part, and remanded to the trial court for determination of the damages, if any, resulting from the preparation of the facility required for housing the Gerber Model 3235 photoplotter.

ANDERSON, J., took no part in the consideration or decision of this case.